UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

10 JUN 28 AM 9: 26

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

NICHOLAS A. MACKALL, *et al.*;          )
                                        )
        Plaintiffs,                     )
                                        )
*v.*                                    )   Cause No.: 1:10-CV-339 RLY-TAB
                                        )
CATHEDRAL TRUSTEES INC., d/b/a          )
CATHEDRAL HIGH SCHOOL, *et al.*         )
                                        )
        Defendants.                     )

## MEMORANDUM IN OPPOSITION TO
## SCHOOL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiffs, Nicholas A. Mackall; Nicholas A. Mackall with his
natural parents, Timothy W. Mackall and Stephanie K. Mackall, collectively; and
Alexandra F. Mackall, a minor, by and with her natural parents, Timothy W. Mackall and
Stephanie K. Mackall, collectively, *pro se*, for its Memorandum in Opposition to
Defendants' Motion for Summary Judgment, and states as follows:

### I. Introduction

Summary judgment is a procedure regularly employed to streamline the judicial
process. It is a process by which a fact finder attempts to determine whether "there is no
genuine issue as to any material fact and that the moving party is entitled to judgment as
a matter of law." By such rule, summary judgment is a procedure of elimination, and
therefore not a process to cause or produce new or additional cause of action.

Therefore, the moving party's motion for summary judgment must clearly fail if and when it enables new or additional cause of action to arise as a result of such a grant as it would clearly, in this case.

For the foregoing reason, the court must deny the School Defendants' motion for summary judgment because said motion is a fraud contemplated due to prior conclusions of law in *Cathedral v Mackall*, 49D05-0807-CV-029352 (Ind. 2009), for the reason that: by such motion, the School Defendants' now employ an alternative theory better suited to the moment, in their attempt to prevail a second time. *Zedner v United States*, 547 U.S. 489, 504 (2006); *Carnegie v Household Int'l, Inc.,* 376 F.3d 656, 660 (7th Cir. 2004).

Accordingly, the School Defendants' motion for summary judgment must therefore fail based on the doctrine of judicial estoppel, as argued and adequately briefed and now before the Court as Plaintiffs Motion for Summary Judgment, and Plaintiffs' Brief in Support, in the instant cause.

While the School Defendants' do need the Court to believe the prior- and instant-cause are identical, the law of the state of Indiana is clear in that "attendance as required by law" and "an education as require by law" are mutually exclusive for purposes of one satisfying the other, or both. *See Hamilton v State of Indiana*, 49A05-9712-JV-518 at 10 (Ind. App. Ct. 1998). "Education is more than merely attending school as required by law." *Id.*

In *Cathedral,* Cathedral Trustees Inc., d/b/a Cathedral High School ("CHS" or the "CHS        enterprise")        made        no        effort        to        show        that,        upon "attendance" of the Mackall children at the Cathedral schoolhouse, CHS either offered or

engaged the Mackall children in "the receipt of knowledge which comes from engaging in a course of study." *Id.* Therefore, by a preponderance of the evidence, the CHS enterprise did prove that the Mackall children did arrive each day at the Cathedral schoolhouse. *See Whittington v Indianapolis Motor Speedway Foundation*, Cause No. 1:06-cv-333-LJM-TAB (S.D. Ind. 2008).

Beyond the arrival each day of the Mackall children at the CHS schoolhouse, the CHS enterprise did neither claim nor mention, nor assert, nor aver, nor invoke, nor elicit nor recall any such provision or participation in any means or manner of satisfying the education as required by law requirement of Nicholas A. Mackall ("NAM") and AFM. *See Plaintiffs' Amended Complaint* ("Pl. Am. Com.") ¶¶ 65 and 66. In fact, the only use of the word "school" in *Cathedral* was limited to the use of the organization's name, Cathedral High School. Affiant in the instant cause, James Williams ("Williams"), was [t]he only witness who did testify on behalf of the CHS enterprise in *Cathedral* and did testify to only those matters herein included by affidavit, which he then did in support of the prior "attendance" claims.

As a result, the issues previously decided were limited to: a) CHS did sell state property, "attendance," a property CHS neither owns nor provides due to the compulsory attendance laws, pursuant to Indiana Code ("IC") § 20-8.1-3, and b) the Mackall children did arrive each day at the Cathedral schoolhouse and therefore, did attend in fulfillment of their state law requirements. *See* Pl. Am. Com. ¶¶ 65, 66 and 82.

For all of the foregoing reasons, the CHS enterprise must be estopped and the School Defendants motion for summary judgment must also fail. Should the School Defendants somehow here succeed, such a ruling would thereby indicate that the

education as required by law requirement, as provided by the CHS enterprise, is thus, free.

The Court is undoubtedly wise and will therefore take notice that the School Defendants have gone to great lengths, by and through their pleadings, to discuss the issue of tuition and the Mackall's failure to pay such tuition and costs however, not once have the School Defendants been so inclined to present and thus, discuss the actual claims made in the prior cause, seemingly and therefore hoping that the Court will decidedly and merely presume that once the Mackall children did each day arrive at the CHS schoolhouse, CHS did provide and thus, participate in the Mackall children's acquisition of knowledge. By such failure in *Cathedral*, the School Defendants' pleadings are therefore unavailing due to significant material facts *do exist* which warrant a trial. Now, in the instant cause, this Court must determine, not the truth of the asserted matters, but rather whether there is genuine factual issue for trial. *See EEOC v Sears Roebuck & Co.*, F.3d 432, 436 (7th Cir. 2000).

Under the present theory here presented by the School Defendants, the School Defendants would have—rather, hope—the Court believe that merely by being in attendance at CHS, CHS did therefore satisfy [a]ll of its obligations to the Mackall's, and presumably, all others. Of course, such a theory must rely exclusively upon the presumption that other acts did thereafter occur and, most importantly, that the party providing the attendance [CHS] did provide or participate in such occurrences in favor of the attendants. Based on such a misguided theory, every person who did attend a place where a [hypothetical] murder did occur, including the owners of the place where said

4

[hypothetical] murder did occur, did therefore participate in said [hypothetical] murder by reason of such place ownership and attendance.

Furthermore, a grant of the movant's motion would require the Court to ignore every fact related to the School Defendants' making of their own lie, the lie of Indiana University-Bloomington, and the lie of Boston College, and the lie of Butler University, and the lie of the University of Dayton, and the lie of Marquette University and finally, the lie of Xavier University. *See Pl. Am. Com.* ¶¶ 86, A, B & C, 89, 112A, 132, A, B and C.

In the interests of justice, the Court will undoubtedly and appropriately deny the School Defendants motion for summary judgment.

## II. Undisputed Facts

### A. The Plaintiffs

The named Plaintiffs are undisputed. Pl. Am. Com., ¶4.

### B. The Defendants

1.      The CHS enterprise [i]s the primary Defendant. Pl. Am. Com., ¶5.

2.      The Plaintiffs dispute the balance of School Defendants list of "Cathedral employees as Defendants in their individual and official capacities." Defendants', Dezelan is a private insurance salesman and therefore not, an employee of CHS, David P. Lewis is an executive of Eli Lilly Pharmaceuticals, Inc. and therefore not an employee of CHS, Denise Farrell was Vice Principal and a CHS administrator, now retired. In

addition, CHS teacher, Greg Bamrick has been dismissed from the instant cause by the Plaintiffs.

Furthermore, by the Plaintiffs Amended Complaint, Plaintiffs have added other CHS teachers who did participate in the CHS fraud scheme, namely:

- Mary Sue Frieberger, CHS teacher. Pl. Am. Com., ¶15;
- Tracy Pennyman, former CHS teacher. Pl. Am. Com., ¶16;
- Katie Gallagher, CHS teacher. Pl. Am. Com., ¶18;
- Elizabeth Hoyt-Craft, CHS teacher. Pl. Am. Com., ¶20;
- Zac Karanovich, CHS teacher. Pl. Am. Com., ¶22; and
- Aarti Brooks, CHS teacher. Pl. Am. Com., ¶23;

All named School Defendants are sued in their individual and official capacities.

### C. The Tuition Policy and Lack of Payments

1.     All monetary issues relating to tuition and costs were resolved in *Cathedral*. The Mackall's did willfully and intentionally fail to pay CHS for state property, "attendance," as there claimed, which is undisputed.

2.     Plaintiffs dispute such claim that any monies are now owed the CHS enterprise.

3.     The School Defendants claim that the Mackall's signed the "Payment Options Selection and Tuition Agreement Form" is not disputed.

4.     Based upon the prevailing "Tuition Payment Policy," located on page 43 of the 2007-2008 Handbook and enrollment contract, No. 4. "At all times, Business

Office staff may use their discretion to accept payment arrangements which would result in the shortest possible payment schedule." See Pl. Am. Com., EXHIBIT #5;

      A)     Defendant, Stephen J. Helmich ("Helmich"), as president of CHS, did also enjoy such "discretion to accept payment arrangements";

      B)     each of the four- (4) years the Mackall's did enroll children at CHS, the Mackall's did have an arrangement and plan, negotiated with Helmich directly, each year, that did provide CHS with the "shortest possible payment arrangement";

      C)     each year, Helmich did accept from the Mackall's such a tuition arrangement and plan separate and apart from every plan offered upon the "Payment Options Selection and Tuition Agreement Form" located at Williams Aff'd., Exhibit "A", see also Pl. Am. Com. ¶ 100;

      I)     each of the years there associated, prior to the 2007-2008 school year, the Mackall's did make all payments per their annual and usual tuition arrangement and plan with Helmich, on or about February 1st of each school year.

      a)     furthermore, as **EXHIBIT #1**, attached herewith, the Plaintiffs include a letter from Helmich, which by reference, indicates the Mackall's annual and usual tuition arrangement and plan. See also Pl. Am. Com. ¶¶ 178 – 79, 180 – 81.

      II)     such annual and usual tuition arrangement and plan between the Mackall's and CHS, upon re-agreement after execution of

"Payment Options Selection and Tuition Agreement Form" did render impotent and thus, did make void, such prior agreement previously selected upon the Payment Options Selection and Tuition Agreement Form, pursuant to Affiant Williams' prior testimony in *Cathedral*.

D)    by Helmich assertion to TWM on 13 February 2008, approximately one hundred, sixty- (160) families did negotiate, during the 2007-2008 school year, tuition and arrangements and plans separate and apart from the "Payment Options Selection and Tuition Agreement Form" options located upon Williams Aff'd., Exhibit "A"; and

E)    for the foregoing reasons the "Payment Options Selection and Tuition Agreement Form" as Williams Aff'd., Exhibit "A" is invalid, which is known to the School Defendants however, the School Defendants must hold true to such a position due to any inconsistency is likely perjury upon Affiant Williams, who did affirm, by his oral testimony in *Cathedral* that such a "Payment Options Selection and Tuition Agreement Form" was and is the prevailing tuition agreement for the sale of state property, attendance. As a result, the Plaintiffs dispute the validity of Williams Aff'd., Exhibit "A".

5.    School Defendants claim "Nicholas' tuition and fees charges were $10,025.00," is disputed. Williams Aff'd., Exhibit "B," does not support such claim.

6.    School Defendants claim "AFM's tuition balance was $9,220.00," is disputed. Williams Aff'd., Exhibit "C," does not support such claim.

7.     School Defendants claim "Despite acknowledging signing the payment agreement...," is disputed as ambiguous. It is unclear as to which agreement was signed.

8.     School Defendants claim someone received "the benefits of an education during the 2007-2008 school year," is disputed as the CHS enterprise did not provide nor participate in any means or manner of educating NAM or AFM.

9.     During the 2007-2008 school year, despite a negotiated annual and usual tuition arrangement and plan negotiated directly with Helmich, Plaintiff, Timothy W. Mackall ("TWM") did twice contact Helmich, on 15 September 2007, and 6 January 2008, to, each time, reconfirm the Mackall's annual and usual tuition arrangement and plan and each time, Helmich did reconfirm acceptance by CHS of such arrangement. See Pl. Am. Com., ¶¶ 100 and 123.

A)     as a result, at no time prior to the week of 21 January 2008, were the Mackall's ever in arrears of tuition payments, thus, Plaintiffs dispute that any tuition was overdue resulting in Helmich's 19 November 2007 letter, which did make such false claim;

B)     as stated in Pl. Am. Com., ¶100, Helmich did, each year, fail to reduce said arrangements to writing;

I)     failure to reduce such annual and usual arrangements to writing did then become problematic given Helmich's illness, which, by information and belief, is the cause of short-term memory loss.

10.     Based on the Plaintiffs tuition and arrangement and plan with Helmich, due on or about 1 February 2008, Helmich letters dated 19 November 2007 and 12

December 2007, herein incorporated by Helmich Aff'd., Exhibit "A" and "B," respectively, were either mistakes on the part of the business office, likely as a result of Helmich's failure to reduce such Plaintiffs' tuition arrangement and plan to writing or, they were a concerted effort to pressure and attack the Mackall's. See Pl. Am. Com., ¶100.

      A)     the Court should take notice that between such 19 November 2007 and 12 December 2007 letters of claimed tuition arrearsment by the Mackall's, the CHS enterprise, by Defendant, and CHS College Advisor, Kathy Pivonka ("Pivonka"), did disclose the education records of NAM, for NAM to the six- (6) colleges and/or universities where NAM sought admission on 28 November 2007, although she did so disclose such records without the consent of NAM, in violation of school policy, in violation of Family Educational Rights Privacy Act ("FERPA"), in violation of his right to privacy.

11.     As a means of attempting to correct any mistake or concerted attack by such 19 November 2007 and 12 December 2007 letters, TWM did, on 6 January 2008, contact Helmich and once more remind Helmich of the Mackall's annual and usual tuition arrangement and plan, which Helmich did once more acknowledge and accept. See Pl. Am. Com., ¶123; see also EXHIBIT #1.

      A)     the aforementioned reminder occurred on 6 January. Less than three weeks later during the week of 21 January, the CHS enterprise, despite such annual and usual tuition arrangement and plan, did knowingly and intentionally disclose false and inaccurate information of NAM, including incomplete grades to

six- (6) post-secondary schools where NAM sought admission. See Pl. Am. Com.,
¶¶ 127 - 132, 132(A), 132(B), 132(C) – 134; and

B)      such action was beyond comprehension given the Plaintiffs annual
and usual tuition arrangement and plan. Nevertheless, Helmich quickly dispelled
such mistake by claiming a favorite mantra: "as a catholic school, he didn't have
to." For such Helmich stance, the Mackall's did thereafter withhold payment of
tuition and costs due CHS on or about 1 February 2008 in an attempt to compel
correction of NAM's education record. See Pl. Am. Com. ¶ 125.

12.     Furthermore, the CHS enterprise did neither ask nor require the removal of
NAM or AFM from CHS for the second semester as result of some now claimed tuition
arrearsment, pursuant to school policy.

13.     School Defendants fail to distinguish which Tuition Payment Policy they
herein refer that Plaintiffs did violate. See Pl. Am. Com., ¶ 86 and corresponding
EXHIBIT #3 or ¶¶ 97 - 99 and corresponding EXHIBIT #5. See also Pl. Am. Com. ¶¶
158 - 162, 164, 164(A), 164(B), 165 - 168(A)(IV). Upon such ambiguity and therefore
failure to accurately convey a claimed position, Plaintiffs dispute clearly what School
Defendants have failed to state as fact. Such lack of clarity is indicative of facts in dispute
and further reasoning to deny said motion for summary judgment.

14.     Accordingly, for all of the reasons previously stated, the School
Defendants motion for summary judgment must fail.

### D. The Transcript Issue

1.      The Plaintiffs do not dispute that NAM, during the 2007-2008 school year, "began the post-secondary admissions process."

2.      School Defendants claim of "Stephanie K. Mackall ("SKM") signed a Transcript Release Form "authorize(s) Cathedral High School to release the following records requested for the purposes of college admission and/or scholarship selection...Transcript," is disputed. Williams Aff'd., ¶ 5, does not speak to any such Transcript Release Form and no such Williams Aff'd., Exhibit "D" does exist.

3.      School Defendants claim "Based on School's policy," is disputed as ambiguous. Again, do School Defendants refer to the executed policy upon each enrollment contract, see Pl. Am. Com. EXHIBIT #5, or do they herein refer to such new and unadopted policy, see Pl. Am. Com. EXHIBIT #3? See also Pl. Am. Com. ¶¶ 158 - 162, 164 - 168(A)(IV). Such ambiguity defies the factual nature required to achieve summary judgment.

4.      School Defendants claim "Nicholas' finals for the fall semester of 2007-2008 School Year were not graded," is undisputed. Five- (5) of NAM's seven- (7) teachers did participate in the theft by omission scheme.

5.      School Defendants claim of "he was given an incomplete in each of these classes," is disputed. As a child, my mother sometimes did chide me "that if, so-and-so did jump off a bridge, are you going to follow him?" Apparently, two- (2) of NAM's teachers, Hunker and G. Bamrick, did also know of and did therefore heed, such childhood teachings and from such teachings did act intelligently, professionally, and as

adults and did therefore fail to oblige any Helmich edict or directive that did cause other teachers to participate in the theft of student scores and grades.

6.     The School Defendants "did knowingly and intentionally distribute and disclose incomplete Records of Plaintiff NAM to six- (6) colleges and universities including: Indiana University-Bloomington, Butler University, University of Dayton, Xavier University, Marquette University and Boston College," is undisputed. Such disclosure did occur without the consent of NAM in violation of his right to privacy and did occur for the purpose of obtaining money. CHS policy requires consent, see Pl. Am. Com., EXHIBIT #2; parental consent for students under the age of eighteen- (18) and consent of students over the age of eighteen- (18). Failure to secure consent of NAM, a student over the age of eighteen- (18), at all material times, did violate CHS policy, FERPA and NAM's right to privacy. On only one- (1) occasion, 30 May 2008, did CHS secure written consent of NAM for disclosure, which did occur by request of Defendant, and CHS College Advisor Pivonka, via email request to TWM, which NAM did forthwith provide, but did limit disclosure to Indiana University-Bloomington and did include a one- (1) day expiry. See Pl. Am. Com. ¶¶ 85, 114 – 118, 129, 130, 206, 207, 207(A) and 207(B).

7.     As a result of the disclosure of the week of 21 January 2008, TWM was upset, is undisputed. See Pl. Am. Com. ¶ 174.

8.     The School Defendants claim that, "despite the fact the tuition had never been paid, on February 27, 2008, a transcript was sent to all six colleges with the incompletes removed and replaced with letter grades," is disputed. Helmich Aff'd., ¶ 7;

Exhibit "E" states facts contrary to such claims. Zero of the three- (3) pages located at Helmich Aff'd., Exhibit "E" claim any such "sent" date. In fact, the only factual "sent" date derived by Helmich Aff'd., Exhibit "E", is 28 November 2007.

9.      Helmich Aff'd., ¶ 7; Exhibit "E", which did claim that "True, accurate, authentic and complete copies of documents relating to this decision are attached under Tab 'E,'" are not disputed. By such testimony, Helmich did thereby confirm that [t]he decision to remove the grades of incomplete and replace those formerly incomplete grades with letter grades, did not occur as School Defendants did claim on 27 February 2008, but rather did occur at some unknown date and time after Monday, 7 April 2008, the latest date used in the series of documents Helmich did testify he did use to make such claimed decision.

        A)      Plaintiffs dispute any knowledge of an exact disclosure date, not identified by Helmich Aff'd., Exhibit "E", of a known third disclosure, other than to acknowledge that, by Helmich Aff'd., Exhibit "E", such third disclosure did occur after 7 April 2008, in which CHS did remove all grades of incomplete and replace those formerly incomplete grades with letter grades, which was only learned by email message from the Indiana University-Bloomington Admissions Office to NAM, on or about 1 May 2008. See Pl. Am. Com. ¶ 183.

10.     On 28 March 2008, TWM by email to Pivonka, did rescind the "authorization, previously agreed to by my wife, Stephanie, for the direct participation in any and all ongoing college admissions processes," is undisputed. Such agreement was being used against the Plaintiffs even though it did not authorize the use of the records

due to NAM was eighteen- (18) years of age prior to each and every disclosure of NAM's records.

11.     Accordingly, for all of the reasons previously stated, the School Defendants motion for summary judgment must fail.

### E. The Collection Action

1.     Any claim of "the Mackall's refused to make any payments for either of their two children," is disputed.

2.     On 27 June 2008, TWM did offer to pay the enrollment deposit for AFM and the prior years tuition for AFM. See **EXHIBIT #2** and **#3**, respectively, attached herewith.

3.     School Defendants claim the Mackall's made "repeated promises," and then they also claim "threats and empty promises" by TWM, all of which is disputed as ambiguous. Are "empty promises" the same as "repeated promises" or are they different or perhaps, part of repeated promises? The Plaintiffs cannot possibly discern what "promises" School Defendants here refer.

4.     Helmich Aff'd., ¶ 8; Exhibit "F", claims that Complaint Cause No. 49D05-0807-CC-029352 is a "True, accurate, authentic and complete copy of the Complaint filed in that action is attached under Tab "F," both of which are disputed for the document attached as Exhibit "F" is not complete as here testified.

5.     Helmich Aff'd., ¶ 9; Exhibit "G", is undisputed.

6.      School Defendants assertion of "In the Complaint Reply the Mackall's asserted a counterclaim based upon transmission of the incomplete grades," is disputed. The Plaintiffs make no such claim, counter or otherwise, nor assertions that grades were ever transmitted to any location without the control of CHS in the prior cause. The Mackall's Complaint Reply is a mere answer and affirmative defense, in a manner similar to School Defendants answer, Docket 41 of the instant cause, which also does not assert a counterclaim other than a prayer for "Plaintiff to take nothing by way of their complaint." See Dkt. 41, pg. 32.

7.      School Defendants claim the Mackall's "sought damages in the amount of $76,125.00," is disputed.

8.      The *Cathedral* matter did come on before the court on 4 December 2009, is undisputed.

9.      School Defendants claim "on December 24, 2009, the Mackall's filed a 'Motion to set Aside Findings of Fact, Conclusions of Law and Judgment Pursuant to Trial Rule 60(B) and Request for Re-Trial,'" is undisputed.

10.     Helmich Aff'd., ¶ 15, is disputed for, shockingly, no such paragraph does exist.

11.     Helmich Aff'd., Exhibit "K," is also disputed. No "Motion" there exists.

12.     School Defendants claim "In that Motion the Mackall's 'allege fraud during the Trial of December 4, 2009...Defendants allege perjury during the trial of December 4, 2009.' *Id.*, p. 4-5," is disputed due to the inequity of fact here claimed by Helmich at Helmich Aff'd., ¶ 15; Exhibit "K".

13.    On 29 December 2009, state court did issue its Findings of Fact, Conclusions of Law and Judgment in favor of the CHS enterprise and against TWM and SKM, and therefore, Helmich Aff'd., ¶ 11; Exhibit "I," are undisputed.

14.    School Defendants claim "In response to the Judgment, on 8 January 2010, the Mackall's filed a Motion for Leave to Amend Counterclaim and Third-Party Complaint…," is disputed. The Mackall's filed no responsive motions.

15.    School Defendants also claim "again asserting most of the relevant state law claims presented herein," is disputed as stated. Most is a verb used frequently to describe a majority, which is herein inaccurate. It should also be pointed out that, other than murder, the same act can occur upon any person multiple times. By the School Defendants obscure reasoning, a harmed party is only entitled one cause of action no matter how many times they are harmed. Such logic is destined to doom the School Defendants motion for summary judgment.

16.    Helmich Aff'd., ¶ 13; Exhibit "K," is undisputed.

17.    Accordingly, for all of the reasons previously stated, the School Defendants motion for summary judgment must fail.

### F. The Second Lawsuit

1.    School Defendants claim "In response to the Order barring them from further filings…," is disputed. Again, no such response was filed by the Mackall's.

2.    School Defendants claim, supported by Helmich Aff'd., ¶ 14; Exhibit "L," that "A true, accurate, authentic and complete copy of the Complaint [*Timothy and*

*Stephanie Mackall v Cathedral Trustees Inc., d/b/a Cathedral High School v. James Williams, and Jean M. Harris*] filed in that action is attached under Tab "L," is disputed. By all knowledge and belief, CHS has not sued James Williams and Jean M. Harris and any Complaint located at Exhibit "L" does not reflect such claim.

      3.    School Defendants claim, supported by Helmich Aff'd., ¶ 14, Cause No. 49D03-1002-CT-007696 is attached as Helmich Aff'd., Exhibit "L," is disputed. No such Cause No. can be found at that claimed location.

      The Plaintiffs are hopeful the Court does take notice of the frequency of such misrepresentations by Affiants Williams and Helmich, which each did "affirm under the penalties of perjury that the foregoing representations are true and accurate to the best of my knowledge and belief." Furthermore, such consistent and reckless misrepresentations by these gentlemen are indicative of their disdain for the Plaintiffs, authority other than their own, and lacking in respect for the Court. Such behavior is pervasive throughout the management of CHS.

      Furthermore, perjury charges should be brought against each of Williams and Helmich for such consistent and egregious mischaracterizations upon their Affidavits. Such mischaracterizations are here used as a means of gained advantage for the School Defendants, in an attempt to prejudice the Plaintiffs and such actions are further cause for this Court to deny such School Defendants motion for summary judgment.

      4.    Accordingly, for all of the reasons previously stated, the School Defendants motion for summary judgment must fail.

### G. The Third Lawsuit

1.     Any such state court litigation herein referred is disputed due to all such reference herein made is supported by false and inaccurate claims and an Exhibit not found at the claimed location, Helmich Aff'd., ¶ 14; Exhibit "L".

2.     The Plaintiffs did file suit in United States District Court against the School Defendants is undisputed.

3.     School Defendants discussion of summary judgment during a Pre-Trial Hearing is disputed.

## III. Discussion

### A. Standard of Review

The Plaintiffs have repeatedly shown in the foregoing that such standard of review is clearly in favor of the non-moving party—the Plaintiffs. The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *Scheiker v Fortis Insurance Co.,* 200 F.3d 1055, 1057 (7th Cir. 2000); *Baron v City of Highland Park*, 195 F.3d 337-38 (7th Cir. 1999). For the movant to be successful with his bid for summary judgment, he must first overcome *Hamilton*, 49A05-9712-JV-518, (Ind. App. Ct. 1998). Failure to show that "attendance as required by law" and "education as required by law" are equal and thus, one does indeed satisfy the other, dooms School Defendants motion for summary judgment. This fact became further settled upon the CHS enterprise assignation of the entirety of the Mackall's tuition and costs to the prior attendance claims, which is a true, accurate and complete indication of the service provided; a service inferior to the service originally sold.

The United States Constitution, *see U.S. Const. Am. I*, guarantees students the right to choose a non-public education, for such a privilege, tuition by charge. The free exercise of school attendance for every Indiana resident under the age of eighteen- (18) is strictly prohibited by state prerogative and the preponderance of the evidence in *Cathedral* shows only that the Mackall children did each day attend the CHS schoolhouse.

Due to the prior "attendance" claims in *Cathedral*, the CHS enterprise is here estopped from any and all claims of sale of- or participation in- the education of NAM and AFM so as to eliminate the appearance of fraud in either the first cause or the instant cause by forcing a modicum of consistency on a repeating litigant—the CHS enterprise. *Ladd v ITT Corp.,* 148 F.3d (7th Cir. 1998). By such prior claims in *Cathedral*, the CHS enterprise did exhaust its Full, Faith and Credit relating to the means and manner of satisfying the education as required by law requirement of NAM and AFM—they did [o]nly provide a schoolhouse for students to there congregate. *See Migra v Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 80-81 (1984). For such schoolhouse provision, the CHS enterprise did assign the entirety of tuition and costs.

And finally, because the Plaintiffs are *pro se*, the Court has a higher standard of review when faced with motions for summary judgment or to dismiss. See *White v Bloom*, 621 F.2d 276 (8th Cir. 1981); quoting *Sparkman v McFarlin,* 601 F.2d 261 (7th Cir. 1979) (En Banc).

## B. Threshold Legal Issues

### 1. *Pro se* litigant status baring claims made on behalf of AFM

A.    AFM is a minor at all times, therefore her parents act for and on her behalf. No precedent in law requires a minor, who is not of an age to legally contract on his or her own, to represent themselves;

B.    *Navin* is herein irrelevant. In *Navin v Park Ridge School District 64*, 270 F.3d 1147, 1448 (7th Cir. 2001), the father, Patrick Navin was and is divorced from the son's mother, and by such divorce decree, Patrick Navin is not the custodial caretaker of the child and therefore was barred from representing the child in the quoted action. No such bar here exists; and

C.    accordingly, and for all the reasons previously stated, School Defendants claim does fail.

## 2. Federal Claims under 42 U.S.C. § 1983

A.    pursuant to Pl. Am. Com., EXHIBIT #7, which did subscribe agency upon the CHS enterprise by Indiana University-Bloomington, an agent of the state of Indiana. As such agent, the CHS enterprise did act, at all materials times, under color of state law. See also Pl. Am. Com. ¶¶ 106 – 108;

I)    "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color of law' for purposes of the statute. To act 'under color of law' does not require that the accused be an officer of the State. It is enough that he is a willing participant in joint activity with the State or its agents, *Adickes v S.H. Kress & Co.,* 398 U.S. 144, 150 (1970), quoting "*United State v Price*, 383 U.S. 787, 794 (1966); and

21

II)        the School Defendants, by and through intentional acts, did deprive the Plaintiffs of rights as guaranteed by the United States Constitution. See Pl. Am. Com. ¶¶ 81, 114, 115, 129, 130, 132(C), 137, 142, 143, 165(A), 166, 184, 185, 197, 197(C), 213 -214 ; see also Pl. Am. Com. EXHIBIT #11.

B.        at all material times, the School Defendants did participate in a civil conspiracy with the government, by performing legal acts in an unlawful manner. See Pl. Am. Com. ¶¶ 167(A), 201(A)(I) and 202; and

C.        accordingly, and for all the reasons previously stated, School Defendants claim does fail.

### 3. Nicholas Mackall's Statute of Limitations Problems

A.        pursuant to the Discovery Rule, IC § 34-11-2-4, the statute of limitations did begin to accrue on or about 1 May 2008. Under Indiana's discovery rule, a cause of action accrues and the statute begins to run from the date when Plaintiffs knew or could have discovered an injury. See *Del Vecchio v. Conseco*, Inc., 788 N.E.2d 446, 449 (Ind. Ct. App. 2003), trans. denied; see also Pl. Am. Com. ¶¶ 139 – 40. Therefore, the harm caused Plaintiff was not discoverable until such time as the harm did subside. The harm caused by the School Defendants' bad acts did subside only upon notification of such education records correction by the Indiana University-Bloomington Admissions Office, which did only occur on or about 1 May 2008. *See Kroger, et. al. v Hinders*, Cause No. 34A02-0112-CV-893, quoting *Martin v Richey*, 711 N.E.2d 1273, 1279 (Ind. 1999); see also Pl. Am. Com. ¶ 183. Furthermore, such claim is clearly reinforced by the School Defendants own admission at Helmich Aff'd., ¶ 7; Exhibit "E," all of the documents used

to "decide" when and if to remove the incomplete grades and replace those incomplete grades with letter grades, could not, and by such admission, did not occur until 7 April 2008, at the earliest date—see the Exhibit, pg. 2. As a result, and therefore, by such Helmich testimony, all NAM claims are within the general two- (2) year statute of limitations therefore, School Defendants claim does fail.

### 4. *Res judicata* Problems

The Doctrine of *Res judicata* is a discretionary principle and factual determinations are reviewed for clear error. *Robinson v Tyson Foods*, 595 F.3d 1269, 1273 (11th Cir. 2010).

That being said, the Court will have now been fully briefed on the opinions of each of the Party's and from there, will make history.

To do so, the Court must first determine the predominance of "attendance as required by law" when compared to an "education as required by law." Accordingly, *Hamilton*, 49A05-9712-JV-518, (Ind. App. Ct. 1998), is the controlling precedent for such determination. "Disregarding controlling precedent, we cannot do." *See Bissessur v Indiana University Board of Trustees, et. al.*, CV-1290-SEB-WGH (S.D. Ind. 2008).

Upon such a decision, the differences in legal theories of the CHS enterprise are thereby addressed. Clearly, for the Court to hold with precedent, the CHS enterprise will be here estopped from asserting an alternate legal theory [prior: sale of attendance – latter: sale of an education] thus, the movant's motion will thereby fail and the Plaintiffs will then be free to assert their claims upon the School Defendants. Furthermore, such a ruling would maintain a modicum of consistency due to the fact that the Mackall's agreed

23

only to purchase one- (1) service from CHS, and by sale agreement, CHS did claim, the service they did provide was and is attendance, a property they neither own nor control, which now leaves them with no alternative but, to claim that that cause and this are identical, because now, they have no defense for such prior calculated strategy.

For the Court to here and now allow the CHS enterprise to claim they either did provide or they did participate in the provision of an education of NAM and AFM after they did assign all of the tuition and costs to attendance, a wholly separate and alternative service, would be tantamount to allowing the CHS enterprise to claim they did sell two-(2) services, which they clearly did not. See Pl. Motion for Summary Judgment, ¶ 29.

Such a sale of attendance must be viewed as a membership agreement, just like any membership purchased at a neighborhood health club. A membership agreement is merely a grant of attendance to a member, nothing more. For a health club, that is business as usual. However, State law prohibits such an arrangement by a school likely because, by such arrangement, the responsibility of those providing attendance ends at the close of sale.

Due to the acts of the prior cause and the present do not arise based on the same claim between the party's, the burden of four- (4) at *Finke v Northern Indiana Public Service Co.*, 899 N.E.2d 5, 11 (Ind. App. Ct. 2008), are here irrelevant.

The Mackall's did err in the prior cause, they did fail to counterclaim: a) False Claim violation of IC § 20-8.1-3 and perhaps b) violation of the First Amendment to the United States Constitution for infringement upon the Mackall's right to choose a non-public education by such attempt to charge for attendance, likely, the only claims then

24

available to the Mackall's. Beyond those claims, no other cause of action did arise within *Cathedral*, until such time as the CHS enterprise did enter, at trial, documents created in support of another purpose, and did, in the person of Affiant Williams, provide testimony in support of the documents created for another purpose, which did support the false claims.

For their action at the 4 December 2009 trial, the Mackall's did bring suit against *Cathedral Trustees, Inc., d/b/a Cathedral High School; James Williams, in his individual capacity and under Cathedral High School and Jean M. Harris, in her individual capacity and under Cathedral High School for Abuse of Process and Deception*, original Cause No. 49D07-1002-CT-007696, now 49D03-1002-CT-007696 due to assignment of Superior Court No. 7 is Judge Zore's court, a CHS board member thus, a special judge was thereafter named upon Judge Zore's recusal.

The previously described action arises pursuant to the teachings of *Watson v Auto Advisors, Inc.,* 822 N.E.2d 1017 (Ind. App. Ct. 2005).

> After losing in small claims court and failing to timely appeal to the Superior Court, Watson did file an independent action and asserted the following claims: violations of Federal Fair Debt Collection Practices Act ("FDCPA"), statutory deception, abuse of process, frivolous lawsuit, malicious prosecution and that Klota committed unauthorized practice of law.
>
> In Trial Court, Watson, was estopped from "collaterally attacking" the small claims court judgment, not by *res judicata* as the School Defendants have claimed, but for failing to follow the appropriate court procedure. See *Trook v. Lafayette Bank and Trust Co.*, 581 N.E.2d 941, 945 (Ind. Ct. App. 1991), *trans. denied*. As a result, the trial court did not err in dismissing upon Watson's argument the judgment was void for lack of jurisdiction.
>
> "Watson's brief provides no argument regarding her allegations that the defendants committed statutory deception and brought a frivolous action.

25

Accordingly, those claims are waived." When parties fail to provide argument and citations, we find their arguments are waived for appellate review. *See Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 668 (Ind. Ct. App. 2002) (holding argument waived for failure to cite authority or provide cogent argument), *reh'g denied, trans. denied* 783 N.E.2d 695 (Ind. 2002).

 Watson's remaining claims are that defendants violated the FDCPA and committed unauthorized practice of law, malicious prosecution, and abuse of process. Unlike Watson's request to invalidate the Small Claims Court judgment, those claims are not attempts to undermine the validity of the contract or earlier judgment. Rather, they are claims based on the manner in which defendants brought the action in Small Claims Court. As in *Johnson*, these claims are available to Watson in an independent action. While she could have raised some of them in small claims court as counterclaims, she was not required to do so. *See Johnson v. Anderson*, 590 N.E.2d 1146 (Ind. Ct. App. 1992)

Further, and again, due to the prior cause was a consumer collection matter that involved the sale of attendance, neither NAM nor AFM did there stand in the shoes of TWM or SKM, therefore no privity does exist. Neither NAM nor AFM are successors to the financial responsibility of TWM and SKM in *Cathedral. See Brunswick Corp. v Chrysler Corp.*, 408 F. 2d 335 (7th Cir. 1969).

Furthermore, the instant cause represents new evidence, due to Plaintiffs are, *pro se*, and as such, are essentially ordinary observers to the degree that they could and did understand the law, precedent in law, legal theory and therefore, legal strategy on a timeline reasonably equal to the School Defendants attorneys, or others of equal caliber.

Accordingly, and for all the reasons previously stated, the School Defendants Motion for Summary Judgment does fail.

## B. Individual Legal Claims

### Count I: Federal: Civil Rico Claim, 18 U.S.C. § 1962

1.      School Defendants claim "the Mackall's assert that the School Defendants conspired to defraud them through what they call the CHS Fraud scheme," is undisputed.

2.      School Defendants claim "the CHS Fraud scheme which they allege consisted of denying them access to the children's grades and transcript based on the failure to pay tuition for the 2007-08 school year," is disputed. The fraud scheme arose from policy that was developed and enacted outside the view of the school's contract holders and thereafter enforced without appropriate adoption. See Pl. Am. Com. ¶¶ 158, 159, 159(A), 159(B), 159(C) - 162, 164, 164(A), 164(B), 165, 165(A) - 167, 167(A), 168, 168(A), 168(A)(I), 168(A)(II), 168(A)(III) and 168(A)(IV).

3.      School Defendants claim "Cathedral improperly withheld Nicholas' transcript," is undisputed. Such withholding did occur only as a means to conceal from the Plaintiffs, the intent of the CHS enterprise to disclose the education records of NAM, including incomplete grades, in furtherance of a CHS fraud scheme, which was unknown to the Plaintiffs at that time, to the six- (6) post-secondary schools where he did seek admission. Such a withholding did breach the enrollment contract of NAM.

4.      School Defendants claim "Cathedral improperly withheld Nicholas' transcript because of the debt owed to it based on his failure to pay overdue tuition," is disputed. Due to the Mackall's did have a tuition arrangement and plan for the entirety of the 2007-2008 school year, the Mackall's were never in arrears of tuition at any time, see Pl. Am. Com. ¶¶ 100, 123 – 125, and due to such arrangement, tuition and fees were not yet due CHS on the date in time when CHS did withhold his transcript. Furthermore, the education records of both NAM and AFM were withheld [o]nly from the Plaintiffs in violation of each enrollment contract.

5.     School Defendants claim "They believe that the grades and transcripts are theirs...," is undisputed. See Pl. Am. Com. ¶¶ 155 -157; see also *Bissessur v Indiana University Trustees, et. al.*, CV-1290-SEB-WTL, quoting *Williams v Wendler*, 530 F.3d 584, 589 (7th Cir. 2008). "An education of any type is, as Judge Posner recently characterized it, not property 'in the usual sense of the word.' But clearly there are property interests 'not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings . . . that secure certain benefits and that support claims of entitlement to those benefits.'" *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972).

6.     School Defendants claim "that Cathedral's refusal to provide those transcripts to colleges," is disputed. Cathedral did not refuse to provide transcripts to colleges—they did disclose at least nineteen- (19) separate transcripts.

7.     School Defendants claim "that Cathedral's refusal to provide those transcripts to colleges constituted criminal activity," is disputed. The criminal activity arises out of the disclosure—the willingness to actually provide—of knowingly altered records by CHS, on at least six- (6) separate and distinct occasions, which, by definition, constitute overt acts, thus criminal activity.

8.     School Defendants claim "This precise issue was raised and resolved...by the 9th Circuit in *Juras v Aman Collection Service, Inc.*, is disputed, for two- (2) reasons. 1) in *Jurus*, the transcript was withheld from all parties. In the instant cause, CHS withheld only from the Mackall's to conceal the fraud, deciding to disclose, which clearly isn't withholding, to the schools where NAM and later, AFM either sought promotion or transfer for leverage to force TWM and SKM to acquiesce to the CHS enterprise; and 2)

in *Jurus*, the withholding was an appropriate remedy pursuant to a contract. In the instant cause, withholding is not a remedy granted the CHS administration by the school board and thus, a violation of the enrollment contracts of NAM and AFM.

RICO Claims:

9.      Predicate Acts: Mail fraud, wire fraud and theft. Such predicate acts may have existed prior to the instant cause and at least one of the acts does continue today. See Pl. Am. Com. ¶¶ 89 – 92.

10.     Pattern of Racketeering Activity: CHS did disclose, by means of mail and wire fraud, see Helmich Aff'd., Exhibit "E," pgs. 2 – 3, knowingly altered education records of NAM and AFM, on at least seven documented occasions. Each disclosure is a separate and distinct incident in the pattern. See *Liquid Air Corp. v Rogers*, 834 F.2d 1297, 1304 (7th Circuit 1987); see also Pl. Am. Com. ¶¶ 126 – 127, 212 – 215.

A)      theft by CHS teachers did occur, by information and belief, between or at least 4 and 19 separate and distinct occasions. Such exact answer can only be determined through discovery;

B)      by information and belief, theft of scores and grades by School Defendants continues today; and

C)      such acts involved numerous students in addition to NAM and AFM due to theft continues today. The Plaintiffs will identify all of the other parties affected by the scheme during discovery. For such a reason, summary judgment is now improper. See Pl. Am. Com. ¶¶ 88 – 88(A).

11.     Such continuation of the pattern of activity does survive the 7th Circuit's requirement of a period of activity greater than twelve months. "The requirement of a pattern of racketeering activity is a 'standard, not a rule' and thus its determination depends on the facts and circumstances of the particular case, with no one factor being necessarily determinative." *Morgan v Bank of Waukegan*, 804 F.2d 970, 976 (7th Cir. 1986).

12.     The Enterprise: all School Defendants.

13.     Accordingly, and for all the reasons previously presented, Summary Judgment is now inappropriate prior to discovery.

14.     Accordingly, and for all the reasons previously stated, the School Defendants Motion for Summary Judgment as a matter of law with respect to Count I does fail.

### Count II: State Law: Fraud

1.     All of the School Defendants claims here under are disputed. All of the School Defendants claims are based on a theory that because CHS found it ok to lie to itself, it was and is therefore ok to lie to other schools. Such a theory is unavailing due to the CHS enterprise, a church, has no authority to make or set policy in the public domain or upon the location of any and every state-operated and federally funded school. This cause does arise due to CHS, a church, must not infringe federal law in the public domain or upon the location of any state-operated or federally funded school, which it did upon the moment any state-operated or federally funded school did access the education records of NAM and others, which did conform to some arbitrary and reckless school

policy rather than FERPA, federal law. Whatever rights CHS may enjoy while the education records remained within its control and custody, were waived upon disclosure to any state-operated or federally funded school.

Fraud is a matter of fact and not subject to School Defendants wild theories or conjecture.

2.    Other problems do exist for School Defendants here:

A)    the Mackall's did have, at all material times, a tuition agreement and plan for the 2007-2008 school year therefore such argument does fail, see Pl. Am. Com., EXHIBIT #1 and ¶¶ 100 and 123;

B)    due to the schools' "Incomplete policy" a grade of incomplete cannot be a permanent grade therefore any disclosure of education records including grades of incomplete is therefore inaccurate and thus, fraud, see Pl. Am. Com. ¶¶ 168 – 168(A)(III);

C)    any tuition policy here claimed instructing teachers to willfully omit test scores, resulting in a grade of incomplete is therefore theft of proprietary property. *See Williams v Wendler*, 530 F.3d 584, 589 (7th Cir. 2008). Such theft did therefore create an inaccurate conclusion to be adopted upon the education records of NAM and AFM, by the CHS enterprise. Such disclosure of education records compiled in connection with acts of theft, is therefore fraud;

D)    School Defendants claim they did "refuse to grade his final exams until he made his overdue tuition payment," is disputed. Such a theory is flawed due to; and

31

I)      NAM's education records were disclosed, including grades of incomplete during the week of 21 January 2008 yet the Mackall's tuition agreement and plan did not call for the payment of NAM's and AFM's tuition until or about 1 February 2008. See Pl. Am. Com. ¶¶ 127 and 128; and

II)     School Defendants did remove the incomplete grades and did replace the grades of incomplete with letter grades and then they did represent the education records of NAM, all of which did occur without payment by the Mackall's, therefore such theory does fail due to CHS did make false statements on at least six- (6) occasions thus, they did commit fraud. See Pl. Am. Com. ¶ 169.

E)      by information and belief, the CHS administration never did adopt any tuition policy which the School Defendants did attempt to enforce on or about some date prior to, but not later than, 19 November 2007 therefore, all organized efforts and acts related to such theft, which did result in the creation of fraudulent education records was therefore reckless, arbitrary and illegal. See Pl. Am. Com. ¶¶ 103 – 105(A).

3.      The elements of common law fraud:

A)      **A material representation of past or existing facts, which were false**: grades and scores withheld or removed thus, stolen due to scores and grades are the proprietary property of the Plaintiffs. Such theft by omission did create false material representation upon the education records of NAM and AFM.

Disclosure of the false material representations to persons and schools outside of the control of CHS did execute a fraud upon Plaintiffs.

B)   **Was made with knowledge or reckless ignorance of its falsity**: by a combination of facts they did know despite their reckless ignorance.

I)   by such new or presumed tuition policy at Pl. Am. Com. EXHIBIT #3, enforced by the School Defendants, said policy did indicate "Cathedral High School will not grade final exams, resulting in an '**Incomplete**' for the semester, which neither indicates approval, by intent or process, the disclosure of such false information. See Pl. Am. Com. ¶¶ 86, 88, 89 - 91; and

a)   by such presumed policy, shows such a measure is punitive by design and therefore any result thereof is not true and accurate but derived as punishment, which negates any argument that such resultant incomplete grade is therefore accurate. See Pl. Am. Com. ¶ 86; and

b)   such an action would need be permanent to be accurate and just, which we do know it was not. See Pl. Am. Com. ¶ 169.

II)   pursuant to the schools "incomplete policy" upon the enrollment contract of each of NAM and AFM, which states: "Students who receive an incomplete grade have two weeks to make up missing work. If the grade is not made up it will turn to an "F" grade, which

School Defendants did fail to enforce. See Pl. Am. Com. ¶¶ 168 – 168 (A)(III).

C)    **Was made with the intent to deceive**: as the Court has here witnessed, such policy does not indicate approval to disclose education records including "incomplete" grades, by either intent or process, therefore such acts are and were maintained as legitimate and accurate; thus proper, by those in control of the scheme. Such control did allow those in charge to manipulate other School Defendants into participating without knowledge of the scheme. The Plaintiffs next expect, in furtherance of the need to maintain ignorance by those in control of the scheme, to lay blame upon other School Defendants who did carry-out such fraudulent acts. See Pl. Am. Com. ¶ 128; see also EXHIBIT #3;

D)    **Was rightfully relied upon by the complaining party**: each school that did receive the education records of NAM or AFM did rely upon the information therein contained. As a result of the false material representations therein, NAM was denied consideration for post-secondary school admission and AFM did have to repeat one- (1) course semester due to the reliance on such disclosures. Thereafter, CHS did and does maintain to the Plaintiffs, to each and every school where CHS did disclose false and inaccurate information, including incomplete grades, and now, to this Court, that all of their acts and actions were reasonable and within their purview. Such acts and actions did cause all of the party's to clearly rely upon such fraudulent disclosure.

E)    **Proximately caused injury to the complaining party**: by such fraudulent acts, the Plaintiffs were proximately harmed, namely:

34

I)      NAM was deprived consideration for post-secondary school admission;

II)     such fraudulent acts did violate the privacy of the Plaintiffs;

III)    such fraudulent disclosure did treat the Plaintiffs differently than others similarly situated, in a conscious-shocking manner;

IV)    by such fraudulent disclosures, NAM and AFM were punished in a manner much worse than other students who did engage in criminal activity, including at least one- (1) student who did leave a "bomb threat" in a CHS boy's lavatory, which did threaten the life and limb of every CHS student and employee; and

V)      by such fraudulent acts, which did arise out of negligence of the School Defendants, the Plaintiffs have suffered significant financial loss.

4.      Multiple schemes did and do exist, namely:

A)      sale of state property despite the belief and intent to provide an education as required by law;

B)      theft by omission of proprietary property (scores, grades & education records) for purpose of obtaining money;

C)      theft of grades as punishment for violations of a students enrollment contract; and

D)      the disclosure of education records, including false material representations, for the purpose of obtaining money for the return of such

proprietary property, which did only occur due to knowledge that neither the state nor the government would intervene in such disclosure of false material misrepresentations.

5.      Accordingly, and for all the reasons previously presented, Summary Judgment is now inappropriate prior to discovery.

6.      Accordingly, and for all the reasons previously stated, the School Defendants Motion for Summary Judgment as a matter of law with respect to Count II does fail.

### Count III: State Law: Conversion, IC § 35-43-4

1.      At all relevant times, the School Defendants did knowingly and intentionally exert unauthorized control over the Plaintiffs proprietary property by failing to compensate the Plaintiffs for the same, thus committing Conversion. See Pl. Am. Com. ¶¶ 92 and 95.

2.      Accordingly, and for all the reasons previously stated, the School Defendants Motion for Summary Judgment as a matter of law with respect to Count III does fail.

### Count IV: State Law: Indiana Deceptive Sales Act IC § 24-5-0.5-2

1.      The Plaintiffs have demonstrated all of the elements of fraud committed by the School Defendants under Count II above therefore the School Defendants claims here under are disputed.

2.      The Plaintiffs have also demonstrated, by admission of the School Defendants, such a statute of limitation argument does fail by Helmich Aff'd., ¶ 7; Exhibit "E;" and the Indiana Discovery Rule, IC § 34-11-2-4. See Pl. Am. Com. ¶¶ 139 – 40.

3.      Accordingly, and for all the reasons previously stated, the School Defendants Motion for Summary Judgment as a matter of law with respect to Count IV does fail.

<u>Count V: State Law: Breach of Contract</u>

1.      School Defendants claim " the Mackall's assert that the School breached its contract with them to provide an adequate education and related matters," is disputed. On the contrary, Plaintiffs allege CHS did neither provide nor participate in educating NAM or AFM and, by extension, all other students, due to the sale of attendance in *Cathedral*. Such complete and willful failure is not malpractice. Malpractice did require participation in the education of all students on some level. As a result, the CHS enterprise did likely commit educational neglect, a violation of IC § 35-46-1-4.

2.      School Defendants claim "the Mackall's are claiming that the School committed educational malpractice," is disputed. The Plaintiffs have alleged the School Defendants did fail to perform, namely:

A)      by and through their assignation of the entirety of tuition and costs to attendance, the CHS enterprise did therefore only provide the schoolhouse for which NAM and AFM and all other students did each day attend, after the CHS enterprise did contract to sell an education and all that implies for purposes of the fulfillment of the education as required by law requirement of NAM and AFM. See Pl. Am. Com. 65, 66 and 82;

B)      such a failure to provide an education to NAM and AFM and all other students, by extension, did breach the loyalty owed the Plaintiffs and all others and by such breach, termination of agency relationship due to the only basis for the authority had been that relationship. See *International Airport*

37

*Centers v Citrin*, 440 F.3d 418 (7th Cir. 2006); quoting *State v. DiGiulio*, 835 P.2d 488, 492 (Ariz. App. 1992). "Unless otherwise agreed, the authority of the agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal." *Id.*; *Restatement, supra*, § 112; see also *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc., supra*, 119 F. Supp. 2d at 1123, 1125; cf. *Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184, 201- 02 (2d Cir. 2003) (per curiam); *Restatement, supra*, § 409(1) and comment b and illustration 2;

C)       the failure of the CHS enterprise to adopt policy amendments pursuant to provisions of the enrolment contract of NAM and AFM, did violate the contract of each Plaintiff. See Pl. Am. Com. ¶¶ 103 – 105(A);

D)       as a result of the failure to adopt policy amendments pursuant to provisions of the enrollment contracts of NAM and AFM, any and all acts of theft by omission of scores and grades did violate the contract of each of the Plaintiffs. See Pl. Am. Com. ¶¶ 86, 87, 89 – 91, 97 – 99, 104 – 105;

E)       as a result of the failure to adopt policy amendments pursuant to provisions of the enrollment contracts of NAM and AFM, any and all acts of theft by omission of scores and grades did cause grades of incomplete to post upon the education records of each of NAM and AFM, which did breach the contract of each of the Plaintiffs. See Pl. Am. Com. ¶¶ 104 and 105; and

F)       disclosure of education records to schools where NAM sought promotion or AFM sought transfer without the respective consent of NAM and TWM or SKM for AFM, did violate the privacy of each Plaintiff, did violate school policy and federal law, in breach of the Plaintiffs' enrollment contracts.

See Helmich Aff'd., Exhibit "D"; see also Pl. Am. Com. ¶¶ 114 – 17, 126 – 28, 130 – 32 and 212 – 215.

3.      School Defendants claim "the Mackall's are asserting that the School breached the contract with respect to grades, records and related matters, that claim is clearly subsumed within the suit previously litigated," is disputed. The prior cause, *Cathedral*, was a consumer complaint which dealt exclusively with the sale of state property, attendance. No such education or education related matters did there arise. See Pl. Am. Com. ¶¶ 65 – 78, 80 – 84.

4.      Accordingly, and for all the reasons previously presented, Summary Judgment is now inappropriate prior to discovery.

5.      Accordingly, and for all the reasons previously stated, the School Defendants Motion for Summary Judgment as a matter of law with respect to Count V does fail.

Count VI: Federal: Computer Fraud & Abuse Act, 18 U.S.C. § 1030

1.      School Defendants claim "the Mackall's assert that the School violated the Computer Fraud & Abuse Act ("CFAA")(18 U.S.C. § 1030)," is undisputed.

2.      School Defendants claim "that the Mackall's cannot demonstrate a single element of the claim," is disputed.

A)      **Protected Computer**: all grades and scores are stored within a computer at CHS and at least one of those CHS computers is a "protected computer" as defined by 18 U.S.C. § 1030(e)(2)(B), which was and is used in interstate commerce. See Helmich Aff'd., Exhibit "E,' pg. 2 – 3. The Plaintiffs cannot know or be expected to know prior to discovery, which CHS computers are a "protected computer" pursuant § 1030;

39

B)   **Without authorization or exceeds authorization**: due to the breach of loyalty owed the Plaintiffs and by such breach, termination of agency relationship, School Defendants are not and were not authorized to access the education records of NAM and AFM and therefore, any such access gained by any of the School Defendants did therefore exceed authorization. See *International Airport Centers v Citrin*, 440 F.3d 418 (7th Cir. 2006); quoting *State v. DiGiulio*, 835 P.2d 488, 492 (Ariz. App. 1992); see also Pl. Am. Com. ¶¶ 65 – 84 and 145 – 152.

C)   **Has done so "knowingly" and with "intent to defraud"**: the asserted tuition policy entailed and thus, triggered theft by omission which did knowingly create a fraudulent result; a grade of "Incomplete," which the school board did specifically note upon said policy. See Pl. Am. Com. EXHIBIT #3; ¶¶ 86 – 87, 89 -92 and 95; and

D)   **As a result has further[ed] the intended fraud and obtain[ed] anything of value**: by and through such fraudulent acts, the CHS enterprise did obtain the proprietary property of the Plaintiffs. See *Bissessur,* CV-1290-SEB-WGH at 21 (S.D. Ind. 2008); see also Pl. A. Com. ¶¶ 144 – 157.

3.   Accordingly, and for all the reasons previously presented, Summary Judgment is now inappropriate prior to discovery.

4.   Accordingly, and for all the reasons previously stated, the School Defendants Motion for Summary Judgment as a matter of law with respect to Count VI does fail.

Count VII and VIII: 42 U.S.C. § 1983:
8th Amendment, Cruel and Unusual Punishment

1.   Count VII and Count VIII have been dismissed upon the Plaintiffs Motion for Leave to First Amended Complaint.

2.   Upon Pl. Am. Com., Count Four, Cruel and Unusual Punishment, 8th Amendment to the United States Constitution, a Bivens claim, in therefore added. See Pl. Am. Com. ¶¶ 245 – 249.

3.   Such a Count Four is filed pursuant to *Bivens v Six Unknown Named Agents*, 403 U.S. 388 (1971).

4.   By such claim, the Plaintiffs have alleged deprivation of a right secured by the Constitution or the laws of the United States. See Pl. Am Com. ¶¶ 132(C), 165(B) and 185.

5.   The School Defendants did act, at all material times, under color of law due to all of the School Defendants' bad acts were attributable to the federal government pursuant to a conspiracy. See *United States v Price*, 383 U.S. 787, 794 (1966); see also Pl. Am. Com. ¶¶ 186 – 202.

6.   Accordingly, and for all the reasons previously presented, Summary Judgment is now inappropriate prior to discovery.

7.   Accordingly, and for all the reasons previously stated, the School Defendants Motion for Summary Judgment as a matter of law with respect to old Count VII and VIII, now new Count Four upon Pl. Am. Com., does fail.

<u>Counts IX and X: Defamation of Character</u>

1.   School Defendants claim "The determination of whether a communication is defamatory is a question for the court," is undisputed.

2.   Disclosure of the education records of NAM and AFM were defamatory due to under no reasonable logic, can a punitive measure which removes or omits

something earned, a score or grade, property, through theft, and by such removal or omission, theft, did create a deficient assessment of the students' work. That series of events did, by intent and process, recklessly create an education record of arbitrary sufficiency. Disclosure of the education records of NAM and AFM, which did include incomplete grades is reckless and arbitrary and therefore defamatory.

3.    School Defendants claim "First and foremost that the statements made in the grade transcript showing the incomplete was true," is clearly disputed. If such incomplete grades were true, as School Defendants here claim, how do they explain the replacement of all grades of incomplete with letter grades, which did occur without provocation, cause or concession by TWM and SKM. See Pl. Am. Com. ¶¶ 169 – 171.

4.    Accordingly, and for all the reasons previously stated, the School Defendants Motion for Summary Judgment as a matter of law with respect to Count IX and X, does fail.

<u>Counts XI through XVII: 42 U.S.C. § 1983 Claims</u>

1.    Count XI, XII, XIV, XV, XVI and Count XVII have been dismissed upon the Plaintiffs Motion for Leave to First Amended Complaint.

2.    Upon Pl. Am. Com., Count XIII remains, amended and renumbered as Pl. Am. Com. Count Two, Violation of the Civil Rights Act (42 U.S.C. § 1983), attributable to the state of Indiana and therefore did occur under color of state law. See Pl. Am. Com ¶¶ 67 – 69, 106 – 108, 112 - 119 and 231 – 236.

3.    Upon Pl. Am. Com., Count One, Violation of Equal Protection Under the Law, 5th Amendment to the United States Constitution, a Bivens claim, is therefore added. See Pl. Am. Com. ¶¶ 166 – 168(A)(IV) and 223 – 230.

4.      Upon Pl. Am. Com., Count Three, Invasion of Privacy, 1st and 9th Amendment to the United States Constitution, a Bivens claim, is therefore added. See Pl. Am. Com. ¶¶ 237 – 244.

5.      Such Counts One and Three are filed pursuant to *Bivens v Six Unknown Named Agents,* 403 U.S. 388 (1971).

6.      By such claims, the Plaintiffs have alleged deprivation of rights secured by the Constitution or the laws of the United States. See Pl. Am. Com. ¶¶ 132(C), 137, 165(A) and 185.

7.      The School Defendants did act, at all material times, under color of law due to all of the School Defendants' bad acts were attributable to the federal government pursuant to a conspiracy. See *United States v Price*, 383 U.S. 787, 794 (1966); see also Pl. Am. Com. ¶¶ 186 – 202.

8.      Accordingly, and for all the reasons previously presented, Summary Judgment is now inappropriate prior to discovery.

9.      Accordingly, and for all the reasons previously stated, the School Defendants Motion for Summary Judgment as a matter of law with respect to old Counts XI and XVII, now new Counts One, Two and Three upon Pl. Am. Com., does fail.

WHEREFORE, in the interests of justice and for all of the foregoing reasons, School Defendants Motion for Summary Judgment does fail in whole due to School Defendants are Judicially Estopped and for all of the facts herein dispute, and any and all other relief appropriate in the premises.

Respectfully submitted,

_____
Nicholas A. Mackall,

_____
Timothy W. Mackall, and

_____
Stephanie K. Mackall, Plaintiffs

Nicholas A Mackall,
Timothy W. Mackall and
Stephanie K. Mackall
P.O. Box 20096
Indianapolis, IN 46220-0096
(317) 250.8802

DISTRIBUTION:

Thomas E. Wheeler
FROST BROWN TODD, LLC
201 North Illinois Street, Suite 1900
Indianapolis, IN 46204

William L. McCoskey
UNITED STATES ATTORNEY'S OFFICE
Assistant United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN 46204